Matter of Suffolk County Dept. of Social Servs. (2005 NY Slip Op 51120(U))

[*1]

Matter of Suffolk County Dept. of Social Servs.

2005 NY Slip Op 51120(U)

Decided on June 28, 2005

Family Court, Suffolk County

Spinner, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on June 28, 2005

Family Court, Suffolk County
In the Matter of the Suffolk County Department of Social Services, o/b/o JEFFREY T. (DOB 00/00/1991), JOSEPH P. JR. (DOB 00/00/1997), JARIUS P. (DOB 00/00/1998), Children Alleged to be Permanently Neglected by DANETTE T. (DOB 00/00/1966), Respondent.
NN-00000-02/04H

Suffolk County Attorney
Attorney for Petitioner
400 Carleton Avenue
Central Islip, NY 11722
By: Frank Krotschinsky, Esq.
Walter D. Long, Jr., Esq
Attorney for Respondent
490 Wheeler Road
Hauppauge, NY 11788
Kathy B. Small, Esq. Law Guardian
800 Veterans Memorial Highway
Hauppauge, NY 11788

Jeffrey Arlen Spinner, J.
On April 9, 2002, the Suffolk County Department of Social Services (DSS) filed Neglect Petitions against Respondent DANETTE T (DOB: 00/00/1966), on behalf of her children JEFFREY T (DOB: 00/00/1991), JOSEPH P JR. (DOB: 00/00/1997) and JARIUS P (DOB: 00/00/1998), alleging that said children had been neglected by Respondent on various grounds and based upon various facts.
On April 23, 2002, a Determination Upon Fact-Finding Hearing (Neglect) was entered, upon Respondent voluntary, intelligent and knowing admission that she abused both drugs and alcohol, impairing her ability to provide appropriate care for said children.
On May 2, 2002, Modifications of Determination Upon Fact-Finding Hearing (Neglect) were entered, after Respondent voluntarily, intelligently and knowingly admitted abuse of drugs and alcohol, impairing her ability to provide appropriate care for said children, and placing the children in the custody and care of DSS, pending disposition.
On July 18, 2002, a new Fact-Finding Hearing was held upon the prior Determination, after Respondent tested positive for illicit drugs, where it was determined that Respondent had not regularly participated in court ordered programs and had not visited with her children regularly, after which Orders-Modification of Prior Orders were entered on September 30, 2002, suspending any visitation with Respondent's two younger children, and allowing supervised visitation with her older child so long as her drug tests were clean.
On October 21, 2002, the DSS filed Petitions-Violation and Modification of Orders of Disposition, alleging that Respondent willfully, and without just cause, violated the terms and provisions of the prior orders, in that she was administratively discharged from the Family Service League on September 25, 2002, due to her non-compliance; that on September 27, 2002 she was given an opportunity to return to the Family Service League, but that she again failed to maintain an appointment; that she had tested positive for illicit drugs on several occasions, most recently on October 1, 2002 at the Family Treatment Court; that good cause having existed to modify the terms and provisions of the order due to Respondent's failure to comply therewith and her continued use of drugs, DSS requested that Respondent be required to enter into a long-term inpatient drug rehabilitation program or be incarcerated for willful violation of the court order, and DSS further requested that the visitation in effect be modified to prohibit any visitation between Respondent and her children until such time as Respondent has demonstrated sufficient compliance with court mandates.
On December 17, 2002, a Warrant of Arrest was issued for Respondent, due to her failure to appear in court. Respondent was then taken into custody on January 6, 2003, and released on January 9, 2003, after which she was an inpatient at South Oaks Rehabilitation.
[*2]On February 21, 2003, DSS filed Petitions (Extension of Placement and Permanency Hearing) against Respondent, and on February 25, 2003, Respondent was presented with Violation Orders and Orders-Modification of Prior Orders, which she rejected, and the matters were then set down for a fact-finding hearing to be held on April 11, 2003.
On April 11, 2003, Orders-Extension of Placement and Permanency Hearing were entered extending placement until October 11, 2003, and setting forth Conditions of Supervision required before Respondent could resume visitation with her children; Permanent Orders of Protection was also entered. Thereafter, on July 22, 2003, Modification Orders were entered, allowing Respondent weekly unsupervised visitation with her children.
On August 26, 2003, Petitions (Extension of Placement and Permanency Hearing) were filed with the Court, some 15 days beyond the statutory deadline for filing. Thereafter, on October 2, 2003, Orders-Extension of Placement and Permanency Hearing were entered, as well as Orders of Protection for one year, with stay away provisions.
On October 15, 2003, DSS filed Petitions (Violation of Orders of Protection) and Petitions (Violation of Orders of Disposition), claiming various facts, including serious allegations that were stated to have occurred prior to the issuance of the October 2, 2003 Orders-Extension of Placement and Permanency Hearing, to wit: Respondent's admission that she relapsed into substance abuse the week of September 8, 2003; that she tested positive for cocaine on or about September 23, 2003; that she failed to appear at several Drug Treatment Court dates; that she was discharged for non-compliance from her substance abuse treatment program at Catholic Charities on or about September 26, 2003; that on or about October 9, 2003, she attempted to stab her son, Leo J (not a subject of these proceedings), in the chest with a knife, placing him in reasonable fear of physical injury, for which she was arrested and charged with Menacing in the 2nd Degree. DSS requested that Respondent be ordered to again enroll in, and successfully complete, a long term inpatient substance abuse rehabilitation program, or be sentenced to a six month period of incarceration in the Suffolk County Correctional Facility.
On November 5, 2003, a Warrant of Arrest was again issued for Respondent. On December 3, 2003, an inquest was held, and the petitions were deemed satisfied by existing orders. On December 17, 2003 Respondent appeared in court and a new date for a hearing was set. At that time, Respondent was informed that if she failed to appear an inquest would be held. On January 13, 2004, Respondent failed to appear and an inquest was held.
On March 3, 2004, DSS filed Petitions (Permanent Neglect) against Respondent, seeking orders determining Respondent's children to be permanently neglected children, terminating her parental rights and committing the guardianship and custody of said children to DSS, detailing the history of the diligent efforts of DSS to encourage and strengthen the parental relationship.
On July 2, 2004 a hearing was held on the Permanent Neglect Petitions with Respondent absent, after which the petitions were established upon inquest and a dispositional hearing was scheduled for August 16, 2004. On July 30, 2004, DSS filed Petitions (Extension of Placement and Permanency Hearing), which also came before the Court on August 16 and September 10, 2005, at which times Respondent also did not appear, and the matter was adjourned for the County to locate and serve Respondent, after which Respondent was served and did appear in Court. Thereafter, on December 1, 2004, Orders-Extension of Placement and Permanency Hearing were entered, which [*3]did not allow Respondent visitation with her children, subject to Respondent re-entering treatment.
On June 22, 2005, while this decision was being written, DSS filed Petitions (Extension of Placement and Permanency Hearing), with the court, some 12 days beyond the deadline for filing.
The children JEFFREY T (DOB: 00/00/1991), JOSEPH P JR. (DOB: 00/00/1997) and JARIUS P (DOB: 00/00/1998), have been in the care of DSS continuously since April 23, 2002.
EVIDENCE ADDUCED AT THE HEARING
Following the extensive history of this matter, set forth herein above, and vacatur of the inquest on default (due to the fact that Respondent had been incarcerated at both the time of appearance and inquest), the Court set this matter down for trial. On January 28, 2005, and continuing on April 25 and May 11, 2005, the Court held a fact-finding hearing. Petitioner, through production of three witnesses in support of the Petition, and Respondent, as her own witness, in opposition thereto, offered testimonial evidence. The Court was afforded the opportunity to assess the demeanor, credibility and veracity of each of the witnesses who offered testimony in this proceeding.
Petitioner called JOHN W, ASAC, in training for CASAC, a counselor for Catholic Charities Chemical Dependency Program, as its first witness. He testified that Respondent was accepted into their program in February, 2003, which required participation five times per week; that Respondent's participation was good for the first few weeks and random urine tests rendered negative results at least twice per week; that after August, 2003, Respondent's attendance became unstable, she became tired in group, eventually repeatedly falling asleep, because she was working nights driving a taxi; that Respondent was recommended to VESID for a 15 day job training at South Oaks, which she began in September, 2003, but dropped out before completing, because she needed to work, for financial survival; that around August 29, 2003 he lost physical-visual contact with Respondent, only communicating with her by telephone; that after testing positive for alcohol and cocaine, Respondent told him she had gargled with Listerine, causing a positive result, later admitting to being on a binge; that he attempted to get Respondent to return to the facility, but this hearing was the first time he had seen her since August 29, 2003; that telephone contact with her ended in September, 2003, after he told Respondent she required a higher level of care, such as inpatient status at Phoenix House, which caused her to become apprehensive, and then defiant; that Respondent called back a few days later and said she would consider it, but she didn't follow up and he closed her case on September 30, 2003.
Upon cross examination by Respondent's counsel, Mr. W testified that Respondent came to his program for intensive out patient day treatment, from 9 am to 4 pm, 4 to 5 days per week; that in group therapy, usually with 10 to 12 clients, Respondent discussed the consequences of her problems, including her children's placement in the custody of Child Protective Services due to her addition, which caused her great anxiety, but she dealt with it all day with the support of the other clients in group; that Respondent also participated in individual counseling regarding parenting skills, health education, relapse prevention, medication, open end groups and 12 step programs that came to the facility; that Respondent completed a 10 week child parenting group, worked with three different counselors, but wasn't involved in psychotherapy (because their program didn't provide it, although their psychiatrist evaluated her and determined she was not bi-polar), and she was not taking any medication while in program; that Respondent had 170 sessions (170 days) of treatment at Catholic Charities, and although she had Medicaid early on, she was self-pay for the majority of [*4]time because she had no insurance, and therefore had to pay $25 per week; that Respondent was employed as a taxi driver during that period of time when she was paying, but they didn't require her to pay when she was out of work (she was denied medical coverage because she drove taxi after she left treatment sessions each day at 2 pm); that Respondent talked openly about not being able to visit with all of her children, not seeing her children being a major source of stress in her life; that Respondent had constant regular contact with Valerie Ward of Family Treatment Court, her relapse occurring close to her Family Treatment Court graduation (September 2003), her having attained Phase III (treatment three times per week, looking for work, connected to abstinence support system); and that Respondent was referred for VESID because she expressed interest in doing more than "unskilled labor and dead ends".
Upon cross examination by the Law Guardian, Mr. W testified that Respondent missed a few days of treatment in July, 2003, but her attendance became much worse in August, 2003; and that Respondent came in to see him on September 24, 2003, and told him that she had been on an alcohol and cocaine binge for one week.
Upon re-direct examination by Petitioner's Counsel, Mr. W testified that when Respondent entered the program on February 4, 2003, she was not employed, had money problems, had been denied medical coverage and was considering employment; that he advised Respondent against driving a taxi because it interfered with her early treatment schedule; and that Respondent had a long history of chemical dependence.
Upon re-direct examination by Respondent's Counsel, Mr. W testified that, with a long history of chemical dependency, recovery needs longer treatment time and relapses are common; that she was not upset in July 2003, that she had been in treatment for five months and had not received visitation with her children; and that no one discussed Respondent's visitation with her children with him.
Upon re-cross examination by the Law Guardian, Mr. W testified that Child Protective Services neither discussed nor coordinated visitation with him.
Petitioner called JOCELYN C, Suffolk County Department of Social Services Senior Caseworker in Child Protective Services, as its second witness.
Upon cross examination by Respondent's attorney, Ms. C testified that she worked with Respondent from September to November, 2002, thereafter EVELYN W took over from November, 2002 to April, 2003, and she again worked with Respondent from April to January, 2004; that she had no progress notes for October, 2003, because she had no contact with Respondent at that time; that although the Court order regarding Respondent required psychotherapy, no psychological evaluation was done before September 2, 2002; that Respondent would have received psychological evaluation at Outreach; that Respondent was diagnosed as suffering from bi-polar disorder and was placed on prescription Paxil; that on April 22, 2003, she took Respondent's case over from EVELYN W again; that she was aware of Respondent's participation in rehabilitation at Catholic Charities, but she contacted Mr. W at Catholic Charities; that she never told Catholic Charities that Respondent was bi-polar and needed medication; that she gave Respondent verbal progress reports on the children when she met with her in October, 2002, April, 2003, May, 2003, and August, 2003; that she met with Respondent twice at Respondent's apartment in Bay Shore and once at DSS Headquarters, as per Uniform Case Review; that from September to November, 2002, she didn't [*5]arrange for visitation with Respondent's two younger children, and didn't speak with the children's therapist; that Respondent was at Outreach at the time, she didn't speak with Respondent's therapist, and didn't ask the therapists to speak with each other; that from April through October, 2003, Respondent's children were in therapy, but she didn't speak with the children's therapist; that from April through August, 2003, Respondent was in therapy, but she never spoke with her therapist either; that Caseworker EVELYN W sent letter to her therapist; that she followed Respondent's treatment and discussed it with VALERIE W, but never dealt with the treatment agency; that, when shown Mr. W's Monthly Progress report for July, 2003, regarding Respondent (Law Guardian's Exhibit 1 in Evidence), which documented Respondent's continually stated anxiety about being separated from her children, she didn't recall ever seeing it and said if she had she would have taken some action; that copies of reports from Mr. W were given to Child Protective Services and made part of Respondent's case file, and it is standard practice to read reports from agencies , therapists, etc.; and that Respondent told her in October, 2002, she wanted visits with her two younger children, and she didn't want them freed for adoption.
Petitioner called MANUEL C, foster care caseworker at St. Christopher-Ottilie Family Services, as its third witness. He testified that he is familiar with Respondent, being the caseworker for her son, JEFFREY T, who has been in foster care at his agency since July, 2002; that in August, 2003, Respondent had an unsupervised visit with said son, wherein Mr. C dropped the child off to her, then met her four hours later to pick him up; that Respondent had conflicts with visitation through the rest of August, 2003, where she " just didn't show up "; that Respondent did visit her son on August 27, 2003, but was then a 'no show' for visits in the first, second and third weeks in September, 2003, and then called in the fourth week to cancelled a visit to "go job hunting", after which she hung up, and failed to appear for the next visit as well; that he then called DSS in October, 2003; to report Respondents lack of visitation; that Respondent later alleged she had been in jail in Riverhead at the time, and stated, "I don't know why every time I get close to getting my children back, I sabotage it"; and that in November, 2003, one day before Thanksgiving, Respondent called and told him she was living in Amityville, had been accepted into an inpatient facility upstate, and needed money for gas, so he met her at a Mobil Gas Station on NYS Route 110, paid to fill up her tank, gave her the $3.00 in his pocket to get snack from the convenience store there, and she promised to call him on his voice mail to let him know of her safe arrival upstate, but he never heard from her again.
Upon cross examination by Respondent's attorney, Mr. C testified that he has been a supervisor since July, 2002, that he reports to St. Christopher-Ottilie; that Child Protective Services keeps him informs by sending copies of orders; that he attends case reviews and gives information on Respondent's son's progress; that when asked if he attended a case review on April 22, 2003, he responded that, "if there was a case review, then I was present"; that he reviewed his paperwork before he testified; that Respondent " was doing everything she was supposed to until she had another relapse"; that said son has a strong bond with Respondent, and she acts appropriately with him; that St. Christopher-Ottilie had done a sexual abuse assessment on the child, and he was not present, thereafter read the report, but no longer recalls what it said; that he was shown the report, as Respondent's Exhibit A; that the child is in a BOCES special education program, sometimes acted out in school, for which he was sent to a time out room or SER (self evaluation rooms), and SERs are different, some being padded; that the child had never participated in sibling visitation, which he discussed with Child Protective Services, who told him the child's brothers didn't want to see him; and that treatment had not been coordinated between the three brothers.
Upon cross examination by the Law Guardian, Mr. C testified that Respondent did attend visitation at St. Christopher-Ottilie in June, 2002, and was given unsupervised contact due to her compliance at that time.
At the close of the Petitioner's direct case, the Assistant County Attorney asked the Court to take judicial notice of all Family Treatment Court and all neglect petition dockets involving Respondent and her children, which the Court granted, pursuant to CPLR §4511.
Respondent testified on her own behalf, stating that she presently resides in Schenectady, New York; is attending a rehabilitation program at St. Joseph's; that the cases before the Court involve the three youngest of her four sons; that after the children were taken from her she voluntarily entered into a disposition before the Court requiring, among other things, that she successfully complete certain programs; that she participated in Bellport Outreach, a five day outpatient program, where they discussed the detrimental effects of drug use on one's body and thinking process, and the raising of children and the effect on children; that she then went to Catholic Charities, which was the same as Outreach, and completed full comprehensive drug rehabilitation there; that she then participated in St. Joseph's at Saranac Lake, an eighteen week inpatient program; that on March 3, 2004, DSS filed Permanent Neglect Petitions against her; that while other programs addressed how drugs destroy families and people's bodies, St. Joseph's dealt with other issues, including the fact that she was raped as a child, was the child of alcoholics, went through a lot of therapy, and never felt "normal" until she went to St. Joseph's, where they took her back to her rape at the age of seven, and got her to moved forward; that she now understands " I'm ok, it's ok to feel badly ", and " now I don't need drugs anymore "; that " St. Joe's made a world of difference in my recovery "; that she had also been raped by her brother in law; that she hasn't seen her two youngest sons since May, 2002; that she stopped seeing the oldest of her three sons in foster care " because I was not compliant with CPS "; and that she felt overwhelmed by her lack of visitation with her children, and misses her children a great deal, but Child Protective Services kept telling her that her children weren't ready for visitation, because they were very angry at her.
Upon cross examination by the Assistant County Attorney, Respondent testified that she had successfully completed Bellport Outreach in 1998/1999, but the second time, after her relapse, she didn't successfully complete the program; that she didn't successfully complete Catholic Charities; that she traveled to the upstate treatment facility Mr. C had testified about, but when she arrived she learned they required $200 she didn't have and couldn't get; that in 2004 she was charged with assault on her older child, who is not a subject of these petitions.
Upon cross examination by the Law Guardian, Respondent testified that she entered St. Joseph's on July 27, 2004, over four months after the Permanent Neglect Petitions were filed; that when reminded that she was compliant with the Family Treatment Court in April 2003, and asked if she had been promised visitation with her two youngest sons if she remained sober for six months, she stated "I don't recall", and became very tearful and upset; that she conceded that, after becoming a taxi driver in July, 2003, began missing therapy and rehabilitation, and relapsed in September, 2003, failing to attend Family Treatment Court in September and October, 2003, after which she was discharged from Family Treatment Court for non-compliance, was arrested in October, 2003, and participated in no rehabilitation from September, 2003 (when she relapsed into cocaine) to July, 2004 (when she was accepted by St. Joseph's on July 27, 2004); that she was uninsured and had problems finding a rehabilitation program that would accept her; and that she was placed in a [*6]rehabilitation program in New York City April, 2004 from a detoxification facility, but was let go because she had no health insurance.
Upon re-direct examination by Respondent's attorney, Respondent testified that she started driving a taxi because she had to pay rent, child support and Catholic Charities; that she had no health insurance, no medical coverage, because of prior problems; that St. Joseph's found out Medicaid would pay for her medical costs if she was actually in a program, but Medicaid will end when she's discharged from St. Joseph.
In Respondent's closing, her attorney argued that St. Joseph's gave Respondent what she needed to succeed; that it is admitted that Respondent used to come within one or two months of getting her children back, and end up relapsing or in jailed instead; but Respondent had finally learned that she had to heal herself in order to be able to be a mother.
In Petitioner's closing, the Assistant County Attorney argued that the agency wants the Court to terminate the Respondent's parental tights; that Respondent blames everyone else for her troubles, but that it is Respondent who is unable to take the necessary steps to succeed.
In the Law Guardian's closing, on behalf of the children, she argued that, while Respondent now appears to have been able to address her problem and the other horrific issues in her life, it is too late for these children, who have been in foster care twice; that the Respondent tried to comply, but didn't succeed the first time the children were returned, and the children ended up in foster care again; that Respondent didn't abide by the Court's orders; that the children need to move on with their lives; and that Respondent has let far too much time elapse.
FINDINGS OF FACT AND CONCLUSIONS OF LAW
In order for the County's petitions to be sustained, it must be proven to the Court that at least one of the five criteria set forth in Subdivision 4 of Section 384-b of the Social Services Law is extant: (a) both parents are dead; (b) the parent(s) abandoned the child for six months prior to the filing of the petition; (c) the parent(s) are unable to provide proper and adequate care for the child by reason of mental illness or mental retardation, and the child has been in the care of an authorized agency for the year prior to the filing of the petition; (d) the child is a permanently neglected child; or (e) the parents severely or repeatedly abused the child, and the child has been in the care of an authorized agency for the year prior to the initiation of this proceeding. In the case at bar, the County must establish that the children JEFFREY T (DOB: 00/00/1991), JOSEPH P JR. (DOB: 00/00/1997) and JARIUS P (DOB: 00/00/1998), are a permanently neglected children, as contemplated by Section 384-b(4)(d) of the Social Services Law. This must be conclusively proven by clear and convincing evidence as required by Social Services Law section 384-b(3)(g)and not merely by a fair preponderance as is usual in Article 10 proceedings.
The term "permanently neglected child" is, for the purposes of these proceedings, defined in §384-b(7)(a) of the Social Services Law. That section reads, in relevant part, as follows:
"... "permanently neglected child" shall mean a child who is in the care of an authorized agency and whose parent or custodian has failed for a period of more than one year following the date such child came into the care of an authorized agency substantially and continuously or repeatedly to maintain contact with or plan for the future of the child, although physically and financially able to do so, notwithstanding the agency's diligent efforts to encourage and strengthen the parental [*7]relationship, when such efforts will not be detrimental to the best interests of the child."
All of the parties concur that the children were received into the care of DSS on April 23, 2002, and have remained in such foster care placement since that time. This proceeding, therefore, falls squarely within the parameters of Social Services Law section 384-b.
Respondent has failed to exercise regular visitation with the oldest of her three children that are the subject herein, and had no visitation with said child after September 27, 2003, and has maintained no telephone or other contact with the child since that time. At the same time it should be noted that DSS not only did not facilitate visits with Respondent's two younger sons, but informed her, whenever she asked, that the children did not want to see her, and further failed to coordinate therapy between the three brothers, leaving unresolved accusations by the two younger siblings against the older of the three. These facts make it difficult for this Court to make a finding that the agency has exercised due diligence in promoting reunification of this biological family.
As the history of this case recited hereinabove, as well as the testimony of the witnesses referenced hereinabove, including that of the Respondent, the Respondent also has persistently failed to comply with express directives of this Court's prior orders and by so doing, has failed to make any plan whatsoever for the future of the children, as contemplated by the express provisions of the Social Services Law.
Parenthetically, Respondent does succeed in impressing this Court that she has made great strides in her rehabilitation and recovery at St. Joseph's, and that she seems to possess a sincere commitment in earning back her right to her children, although her history makes it requisite that these sincere desires be proven to be attainable on an extended basis.
Then, again, despite the laudable efforts of the Assistant County Attorney, the evidence derived from every source, including those matters taken under judicial notice, fail to support a finding that the endeavors of the agency in this matter were of a positive nature, let alone whether there is any ability to conclude it fulfilled its obligations, as set forth in §384-b of Social Services Law.
The Court finds itself caught in the middle in the instant matter. While Respondent has failed to maintain contact and plan for the children's future, the agency has failed to make diligent efforts to encourage and strengthen the parental relationship, and like a true See-Saw, for every failure that can be laid at the feet of the Respondent, the record demonstrates incomprehensible failures on the part of the agency to make diligent efforts to improve the interrelationship of this family, or even simply a failure to make a record to support a finding of "permanently neglected" children.
The Appellate Division of the Supreme Court, First Department, ruled that evidence a parent failed to make sufficient progress in mandated therapy to the extent deemed necessary by the agency would be sufficient grounds to make a finding of permanent neglect. See In Re Christian Lee R. 779 AD2d 483 (App. Div. 1st Dept., 2004).
In the matter of In Re Star Leslie W. 63 NY2d 136 (Ct. App., 1984), the New York Court Of Appeals, in a unanimous and scholarly opinion authored by Judge Richard D. Simons, ruled that a determination of permanent neglect would only be sustainable after finding that the parents failed to maintain contact with the child or plan for the child's future, as mandated by Section 384-b of the Social Services Law. The Court of Appeals also opined that "...a default in performing either may support a finding of permanent neglect." The Court of Appeals also decreed that the examination [*8]must begin with a determination as to whether the agency exercised diligent efforts to strengthen the parental relationship.
In the matter at bar, the Court must act in the best interests of the children without addressing which, between Respondent and agency, has responsibility for the bigger failures. The Court's record of these proceedings demonstrates, by clear and convincing evidence, that the best interests of the children would be best served by terminating Respondent's parental rights, suspending said judgment for a period of one year in order to afford Respondent the opportunity of one last chance at regular visitation with, and planning for the future of, her children, with the ultimate goal of reuniting her biological family, and simultaneously providing DSS with the opportunity of creating a record that they have made every statutorily mandated diligent effort to encourage and strengthen that family relationship. It is, therefore,
ORDERED, that the Permanent Neglect Petition filed against the Respondent by DSS is hereby granted; that Respondent is in no way relieved of her obligation to continuously or repeatedly maintain contact with, or plan for the future of, her children, and in fact that is exactly what shall be required of her, as will be further set forth in a Dispositional Order; and that Petitioner DSS is in no way relieved of its obligation to make diligent efforts to encourage and strengthen the parental relationship, as set forth in law; and it is further
ORDERED, that a dispositional hearing shall be held on the 15th day of July, 2005,.
This shall constitute the decision, judgment and order of this Court.
Dated: June 28 , 2005
Central Islip, New York_______________________________
HON. JEFFREY ARLEN SPINNER
Judge, County Court
Acting Judge, Family Court
PURSUANT TO SECTION 1113 OF THE FAMILY COURT ACT, AN APPEAL FROM THIS ORDER MUST BE TAKEN WITHIN 30 DAYS OF RECEIPT OF THE ORDER BY APPELLANT IN COURT, 35 DAYS FROM THE DATE OF THE MAILING OF THE ORDER TO APPELLANT BY THE CLERK OF THE COURT, OR 30 DAYS AFTER SERVICE BY A PARTY OR THE LAW GUARDIAN UPON THE APPELLANT, WHICHEVER IS EARLIEST.